[Civil No. 4522.   Filed October 26, 1942.]

[130 Pac. (2d) 56.]

JULIAN DAUBER, Petitioner, v. CITY OF PHOENIX and THE INDUSTRIAL COMMISSION OF ARIZONA, Respondents.

490

Mr. Fred V. Moore, for Petitioner.

Mr. Rouland W. Hill and Mr. Cavette Robert, for Respondents, The Industrial Commission of Arizona.

McALISTER, J.—The petitioner, Julian Dauber, has brought before this court for review, on a writ of certiorari, the findings and award made by the Industrial Commission on February 11, 1942, and affirmed on rehearing, April 25, 1942, denying him compensation for an injury resulting from an accident alleged to have been suffered by him on October 4, 1941, while in the discharge of his duties as an employee of the City of Phoenix.

The facts are not in dispute and may be stated as follows: About three o'clock in the afternoon of that day, the petitioner and three other employees were engaged in cleaning out an eight-inch sanitary sewer pipe line between Eleventh Avenue and Sixth Avenue, and running along the alley between Washington and Adams Streets. The method used was to force through the pipe by water a funnel-shaped object, made of heavy duck canvas, called an "auger" or "kite," which was approximately six inches in diameter and fastened to a steel cable or flexible rod and forced by water

pressure from one manhole to the next. There were four men in the crew, two of them being at Eighth Avenue to manipulate the cable or rod, one at a fire plug at Seventh Avenue to turn the water on and off, and petitioner was sitting in a manhole in the alley near Sixth Avenue in order to disconnect the kite when it reached that point so that the two men at Eighth Avenue could withdraw the rod after forcing the kite through. It is necessary that a person be in the receiving manhole to clean out the mud and slush forced through the pipe and to disconnect the cable from the kite when it reaches the opening in the pipe at the manhole. The sewer pipe runs through the bottom of the manhole and the upper part of it is open, making it possible for sewer gas to escape from it into the manhole. By the process of forcing the kite through the sewer pipe and removing obstructions therein the sewer gas is naturally released and passes through the opening in the top of the pipe into the manhole.

The manhole is about 28 inches in diameter at the top and spreads out in bell shape to approximately four feet to a shelf some six feet below the alley. The upper part of the eight-inch sewer pipe was open in the manhole and flush with the shelf beneath which was a sump about three feet deep and four feet long. As petitioner sat in the manhole about three P. M. on October 4, 1941, ready to disconnect the pipe and cable, he tried to stand up and then he says: "All of a sudden a cloud of gas come in and got me and then I don't know what happened." A member of the crew which was handling the cable at Eighth Avenue went to the manhole, looked in, saw petitioner leaning against the wall of the manhole unconscious, pulled him out and laid him on the ground. He remained unconscious about 15 minutes and upon regaining consciousness was greatly nauseated and began vomiting. Shortly after, some of the crew put him in

the department truck and took him to his home at 1630 East Washington Street, where he was cleaned up and put to bed by his wife. He continued to suffer from severe nausea, so about eight o'clock that evening his wife called Dr. Reed Shupe who gave him an injection of morphine to quiet him and decrease his vomiting. However, his nausea returned as soon as the effect of the narcotic wore off and about 10 o'clock the next evening, October 5th, Dr. Shupe was called again and he then directed that the petitioner be taken to the hospital where his nausea and vomiting continued until eight o'clock the next evening, October 6th, when a perforation of his stomach occurred followed by severe peritonitis. Immediately after this took place, which Dr. Shupe testified was easily detectible, he performed an emergency operation upon his stomach and repaired the perforation. Dauber remained in the hospital until October 29th, when he went to the Veterans' Hospital at Prescott, from which he was taken to the Veterans' Hospital at Tucson, and from there returned home, where he has since been continually confined, totally and completely disabled.

In the month of June, 1941, Mr. Dauber consulted Dr. Joseph Bank, a stomach specialist in Phoenix, who, after an X-ray examination, diagnosed his ailment as duodenal ulcer of the stomach which caused a pyloric obstruction, and advised Dauber to follow a diet which he recommended. Dauber did this and his condition improved. Dr. Bank did not see him again until the hearing before the commission when he testified that Dauber's condition in June was not serious enough to cause him to lay off work and Dr. Shupe stated that when he first saw him, on October 4, 1941, he had, aside from his acute condition, the appearance of a very healthy man, whose weight was up and whose color and general physical condition were good.

Dr. Shupe, who had treated others for sewer gas poisoning, testified that sewer gas poisoning induces nausea and vomiting and that in his opinion inhaling this gas was the efficient cause of the rupture of the ulcer from which Dauber was suffering at the time of the alleged accident. Dr. Bank testified that in his opinion inhaling the gas would aggravate the ulcer from which petitioner was suffering and that a perforation of an ulcer of the stomach is caused by the aggravating of the ulcer.

At the close of the evidence, the Industrial Commission denied compensation upon the ground that the evidence did not show that the disability from which petitioner was suffering was the result of an accidental injury sustained while in the course of his employment by the City of Phoenix. Petitioner contends that his mishap was an accident within the meaning of the Workman's Compensation Law and that the action of the commission is contrary to the evidence and should be set aside. It is, of course, elementary that the petitioner must show that his injury was the result of an accident, within the meaning of the Workman's Compensation Law before he is entitled to compensation, so the first question here is: Was this an accident within the meaning of that law?

As petitioner sat in the manhole waiting to disconnect the hook or kite from the rod or cable, a sudden cloud of sewer gas came into the manhole and rendered him unconscious. About 15 minutes after he was removed from the manhole by one of his crew members, he regained consciousness and immediately became greatly nauseated and began vomiting. This condition kept up until about eight o'clock on the evening of October 6th, except as temporarily relieved by the narcotic administered by the doctor, when the vomiting and retching resulted in a perforation of the stomach

which brought on peritonitis but was repaired by an emergency operation performed by Dr. Shupe at that time. It is clear that the sudden and unexpected coming into the manhole of a cloud of sewer gas in sufficient quantity to render him unconscious was an accident within the meaning of that term, as used in section 56–931, Arizona Code Annotated 1939, providing that "Every employee, . . . who is injured, and the dependents of every such employee who is killed, by accident arising out of and in the course of his employment, . . . shall be entitled to receive, and shall be paid such compensation for loss sustained on account of such injury or death, . . . ". Even though a small quantity of gas is usually looked for in such places, the sudden appearance of such a quantity of it as to render one unconscious was wholly unexpected. Neither the petitioner, nor anyone else, who thought the gas might escape into the manhole in such dangerous quantities, during the process of cleaning the sewer pipe, would have ventured into the manhole where he would breathe it with such serious consequences. Petitioner had smelled the gas many times before in small quantities, but this was the first time a cloud of it had come into the manhole where he was working, and, this being true, it cannot be said he should have known it would be there in such a dangerous quantity and that he assumed whatever risk there was in contacting it. In *Van Vleet* v. *Public Service Company of York,* 111 Neb. 51, 195 N. W. 467, 468, is found this statement: "While the evidence shows that gassing in a mild form is not uncommon among gas workers, it is equally proved that for workmen to be overcome to such an extent as to produce unconsciousness is very uncommon"; and in Taylor's Principles and Practices of Medical Jurisprudence, volume 2, page 573, the author, in discussing poisoning by sewer

gas and exhalations from dead bodies, makes this statement: "The cases are always *accidental,* though it is easily conceivable that a suicide or homicide might thus be effected." Hence, the passing into the manhole of a cloud of gas which rendered petitioner unconscious was an untoward and unexpected event and clearly constituted an accident within the meaning of the compensation law.

The next question is: Did the accident result in injury to the petitioner? The testimony of the only two doctors who appeared as witnesses in the case is that it had the effect of perforating and rupturing his stomach and that this necessitated an emergency operation. Both doctors agreed that the nausea, retching and vomiting produced by the accident caused the injury. According to Dr. Shupe the retching and vomiting were the efficient cause of the rupture of the stomach ulcer, though Dr. Bank's view was that while the retching and vomiting was a factor in producing the rupture, the more important factor was the absence of food which, because of acid, increased erosion of the stomach. So, whether the rupture was produced by the retching and vomiting, or by the absence of food in the stomach for so many hours, is immaterial, since both of these conditions were the result of the nausea and vomiting brought about by the accident. The fact that the gas itself may not have been the direct cause of the rupture is immaterial; it would be just as much the efficient cause thereof, if it set in motion the agencies that did produce it, nausea, retching and vomiting, as it would have been had it caused it directly, and there can be no question but that the nausea, retching and vomiting were brought about by the accident.

The fact that at the time of the accident, and for some months prior thereto, petitioner had been suffering from a duodenal ulcer of the stomach, did not

deprive him of the right to compensation since the accident was the cause of the rupture, for even though the perforation of the stomach would not have resulted from the accident had it not been for its weakened condition produced by the ulcer, the right of petitioner to compensation for the injury was in no way affected thereby. Where an accident aggravates a diseased condition, the rule established by the decisions of this court is that the petitioner is as much entitled to compensation for the injury, as he would have been had it occurred while the person was in a healthy condition. *Hartford Acc., etc., Co.* v. *Industrial Comm.,* 38 Ariz. 307, 299 Pac. 1026. In *Hunter* v. *Wm. Peper Construction Co.,* 46 Ariz. 465, 52 Pac. (2d) 472, 474, this court made the following statement:

"It is of course true, under our decisions, that if some form of physical injury aggravates any already existing physical disease or condition, the injured workman is entitled to compensation to the extent of the disability caused thereby in the same manner as though his condition had been produced originally and directly by the injury."

It is clear from the record that the petitioner was injured in an accident which occurred while he was in the discharge of his duties as an employee of the City of Phoenix, hence he is entitled to compensation.

The award denying him compensation is set aside.

LOCKWOOD, C, J., and ROSS, J., concur.